IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                Case No. 6:12-cr-00267-AA

       Plaintiff,                       OPINION AND ORDER

    v.

REY DAVID PINA-LOPEZ,

       Defendant.

_____

AIKEN, Chief Judge:

Defendant moves to suppress evidence obtained after a traffic stop of a commercial passenger van and the subsequent canine sniff and search of his luggage. Defendant argues that no reasonable suspicion supported the initial traffic stop; the extension of the stop constituted an unlawful seizure under the Fourth Amendment; the canine sniff did not establish probable cause to search his luggage; and, even if probable cause existed, the officers were required to obtain a search warrant to search his luggage.

1    - OPINION AND ORDER

On November 8 and December 6, 2012, the court held evidentiary hearings and heard testimony from three witnesses. The parties then submitted supplemental briefing and the court heard oral argument on January 2, 2013. For the reasons explained below, defendant's motion is granted.

## BACKGROUND FACTS

On April 17, 2012, Cottage Grove Police Officer David Burgin was patrolling Interstate 5 (I-5) pursuant to federal grant funding known as HIDTA (High-Intensity Drug Trafficking Areas). Transcript of Proceedings (Tr.) 7, 36 (Nov. 8, 2012). Under the HIDTA grant, the Cottage Grove Police Department received funding "to engage in enhanced drug interdiction activities." Tr. 36 (Nov. 8, 2012).

At approximately 12:55 p.m., Officer Burgin observed a Fronteras del Norte passenger van traveling northbound on I-5 near Cottage Grove. The van was transporting fourteen passengers, with luggage stowed on top of the van. Fronteras del Norte is a commercial transportation carrier that serves primarily Hispanic passengers traveling from Southern California to the Northwest area. Officer Burgin previously had been informed that narcotics traffickers sometimes traveled on Fronteras del Norte bus lines and that large quantities of drugs had been seized from Fronteras del Norte buses. Tr. 26, 38 (Nov. 8, 2012).

According to Officer Burgin's testimony, the van drifted over the fog line by a full-tire width, and he observed that the van's

2    - OPINION AND ORDER

license plate number was obscured by a ladder attached to the rear of the van. Tr. 11, 13 (Nov. 8, 2012). At 12:56 p.m., Officer Burgin reported to dispatch that he was pulling over a vehicle "with an obstructed California plate." Def's Ex. 8 at 1.

At approximately 12:57 p.m., Officer Burgin stopped the Fronteras del Norte van. Immediately after pulling over the van, Officer Burgin was able to view the license plate in its entirety and called in the number to dispatch. Def.'s Ex. 8 at 1; Tr. 59 (Nov. 8, 2012).

After reporting the license plate number to dispatch at 12:57 p.m., Officer Burgin contacted Officer Ronald Bates, a narcotics canine handler, and asked if he was able to call Officer Burgin's cell phone. Def.'s Ex. 8 at 1; Tr. 57-58 (Nov. 8, 2012). Officer Burgin testified that he contacted Officer Bates because a passenger had jumped out of the van and stared at Officer Burgin "very intently" while "nervously" smoking a cigarette, behavior he found "odd." Tr. 16, 26, 58 (Nov. 8, 2012). Officer Burgin's testimony regarding this passenger conflicts with that of the driver, Gerardo Ramirez-Felix, who testified that no passengers exited the van during the initial traffic stop. Tr. 11 (Dec. 6, 2012). Officer Burgin also admitted that he called Officer Bates because he knew that illegal drugs had been found on Fronteras del Norte vehicles in the past. Tr. 26, 58 (Nov. 8, 2012).

Officer Burgin approached the van, and Mr. Ramirez-Felix

3   - OPINION AND ORDER

provided his driver's license, vehicle registration, proof of insurance and driver's log book. Mr. Ramirez-Felix indicated that he drove the van on a weekly basis from Weed, California to Portland, Oregon. Tr. 6 (Dec. 6, 2012).[1] Officer Burgin informed Mr. Ramirez-Felix that the ladder on the van obscured the license plate and the van had driven on the yellow fog line. Mr. Ramirez-Felix testified that the van's ladder always had been in that location, and he had never been pulled over due to the ladder or the license plate. Tr. 7 (Dec. 6, 2012).

Officer Burgin gave Mr. Ramirez-Felix a verbal warning for the alleged traffic infractions and asked if Mr. Ramirez-Felix would wait for a canine unit to arrive and inspect the van. Mr. Ramirez-Felix agreed; he testified that his employer required him to "cooperate with the law at all times." Tr. 9 (Dec. 6, 2012). At 1:04 p.m., Officer Burgin contacted Officer Bates and asked if he could respond, as Officer Burgin had obtained "consent on a vehicle." Def.'s Ex. 8 at 3.

---

[1] Officer Burgin testified that Mr. Ramirez-Felix told him the van departed from San Ysidro, California, near the California-Mexico border, with its final destination in Washington State. Tr. 22 (Nov. 8, 2012). However, Mr. Ramirez-Felix testified that Fronteras del Norte offers daily bus departures from Los Angeles to Yakima, Washington, with a "changeover" in Weed, California. Tr. 4 (Dec. 6, 2012). There, some passengers depart the larger bus (which continues to Yakima) and travel via the smaller van to Portland, Oregon. Tr. 5 (Dec. 6, 2012). Mr. Ramirez-Felix testified that he informed Officer Burgin that the van departed from Weed and showed Officer Burgin his log book. Tr. 6 (Dec. 6, 2012).

4    - OPINION AND ORDER

Officer Burgin does not speak Spanish and did not possess Spanish-language consent forms at the time of the stop. Tr. 63 (Nov. 8, 2012). Consequently, Officer Burgin asked Mr. Ramirez-Felix to explain "what was occurring" to the passengers in Spanish. Tr. 64-65 (Nov. 8, 2012). Mr. Ramirez-Felix informed the passengers that "there was going to be an inspection of the suitcases and the van." Tr. 9 (Dec. 6, 2012).

Officer Burgin also testified that he asked Mr. Ramirez-Felix to inform the passengers that they were free to leave. Tr. 28, 64-65 (Nov. 8, 2012). However, this request is not noted in Officer Burgin's report. Tr. 65 (Nov. 8, 2012). Mr. Ramirez-Felix testified that he was not asked to tell the passengers they could leave, and he did not so inform them. Tr. 9 (Dec. 6, 2012).

Witness testimony also conflicts as to whether passengers exited the van prior to the canine unit's arrival. Officer Burgin testified that several passengers exited the van and were milling about when Officer Bates arrived. Tr. 66-67 (Nov. 8, 2012). However, Mr. Ramirez-Felix testified that no passengers had exited the van, and that Officer Burgin had asked him to instruct the passengers to remain in the van until the police canine arrived. Tr. 11-12 (Dec. 6, 2012). Consistent with Mr. Ramirez-Felix's testimony, Officer Bates testified that all passengers were inside the van when he arrived at the scene. Tr. 71 (Nov. 8, 2012).

At approximately 1:15 p.m., Officer Bates arrived with Bo, the

5    - OPINION AND ORDER

narcotics canine. Def.'s Ex. 8 at 3. Possibly for the second time, Officer Burgin instructed Mr. Ramirez-Felix to tell the passengers to remain in the van during the canine sniff, ostensibly for their safety. Tr. 28, 67 (Nov. 8, 2012); Tr. 12 (Dec. 6, 2012).

Bo "began to cast" toward the top of the van, and officers placed him on the top of the van where he began sniffing and digging at two pieces of luggage. Tr. 77-79, 95, 97 (Nov. 8, 2012); Tr. 13 (Dec. 6, 2012). Officers and Mr. Ramirez-Felix then removed the luggage from the top of the van and arranged the bags into two lines. Officer Bates deployed Bo again, and he alerted to the same two bags: a black and a brown duffle bag.

Several passengers exited the van after the canine sniff. Officer Burgin testified that he asked Mr. Ramirez-Felix to "make contact with the passengers and identify" the owners of the bags, and Mr. Ramirez-Felix "asked them to step out of the vehicle and come back to where we were at with the bag." Tr. 33-34 (Nov. 8, 2012). Officer Bates likewise testified that after Bo alerted to the duffle bags, Officer Burgin "began asking people to come out and identify their bags," and defendant and another person stepped forward to claim the brown and black duffle bags. Tr. 83 (Nov. 8, 2012). Officer Burgin asked defendant whether the brown duffle bag was his, and "in broken English, [defendant] said yes and nodded his head." Tr. 35 (Nov. 8, 2012).

Officer Bates searched the black duffle bag, belonging to the

6   - OPINION AND ORDER

other passenger, and found no narcotics. In the brown duffle bag, claimed by defendant, Officer Burgin found two packages containing methamphetamine. He reported the discovery at 1:44 p.m.

Defendant was arrested and transported to the local jail. There, Officer Bates assisted with the process of "booking" defendant and discovered the claim ticket corresponding with the brown duffle bag. Tr. 84 (Nov. 8, 2012).

## DISCUSSION

### A. Traffic Stop

Defendant maintains that no reasonable suspicion supported the traffic stop for an obscured license plate,[2] and that Officer Burgin stopped the van for the primary purpose of conducting a canine sniff of the vehicle and luggage. Defendant emphasizes that Officer Burgin was working under the HIDTA grant when he stopped the van and had a personal goal of fifteen HIDTA drug interdiction stops per day. Tr. 44 (Nov. 8, 2012). Defendant further argues that the asserted basis for the traffic stop was predicated on Officer Burgin's mistaken belief that Oregon law requires license plate numbers to be "clearly visible" from "every angle." Tr. 57 (Nov. 8, 2012).

A police officer must have reasonable suspicion that a suspect has been or is involved in criminal activity in order to justify an

---

[2]Although Officer Burgin testified that the van crossed the fog line, the government is not asserting the alleged fog line violation as a valid basis for the traffic stop.

7    - OPINION AND ORDER

investigative stop. See United States v. Lopez-Soto, 205 F.3d 1101, 1104-05 (9th Cir. 2000) (the Fourth Amendment requires only reasonable suspicion to support an investigative traffic stop). In the context of a traffic stop, a police officer must have an objective basis for suspecting a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810, 813 (1996). Further, because the legal justification for a traffic stop must be "objectively grounded," a suspicion based on a "mistaken view of the law cannot be the reasonable suspicion required for the Fourth Amendment." United States v. Twilley, 222 F.3d 1092, 1096 (9th Cir. 2000) (no reasonable suspicion to stop vehicle when an officer mistakenly thought Michigan law required vehicles to have two license plates); see also United States v. King, 244 F.3d 736, 741-42 (9th Cir. 2001) (a mistaken belief that driver's conduct violated the law does not establish reasonable suspicion).

Under Oregon law, license plates "must be in plain view and so as to be read easily by the public"; thus, it is unlawful to alter, modify, cover or obscure license plates "in any manner." Or. Rev. Stat. §§ 803.540(1)(c), 803.550(2). Officer Burgin testified that, while following the van at a distance of three car lengths, the license plate number was obscured by the ladder attached to the rear of the van. However, Officer Burgin did not change lanes or drive closer to view the license plate because of the wet freeway conditions and his belief that Oregon law requires license plate

8   - OPINION AND ORDER

numbers to be clearly visible from "every angle." Tr. 56-57 (Nov. 8, 2012).

The Oregon Court of Appeals has found that a license plate registration visible only from an "unusual position" and obscured "when viewed from the position in which another motorist would view it" violates § 803.550(2). State v. Boatright, 222 Or. App. 406, 411, 414, 193 P.3d 78 (2008). However, no Oregon court has held that license plate numbers or registration must be clearly visible from every angle. I therefore agree with defendant that Officer Burgin was mistaken in his belief that the van's license plate must be visible in its entirety from every angle. See, e.g., United States v. Camacho-Reyes, Case No. 1:03-cr-265-KI (D. Or. Jan. 16, 2004), Op. at 16-17 (§§ 803.540(1)(c) and 803.550 do not require a license plate to be visible from every angle or view). As Officer Burgin did not attempt to view the license plate from other angles or vantage points, the court is limited in its ability to determine whether the facts nonetheless provided an objective basis for the stop. United States v. Wallace, 213 F.3d 1216, 1220-21 (9th Cir. 2000); Boatright, 222 Or. App. at 410, 193 P.3d 78.

Unfortunately, neither party presented photographs of the van's rear license plate at different angles from two or three car lengths to approximate Officer Burgin's view when he initiated the traffic stop. Photographs taken of the van at the scene show that a ladder rung partially obstructs the license plate letters and

9   - OPINION AND ORDER

numbers when viewed at certain angles. Def.'s Exs. 1, 4, 7. However, other photographs show the letters and numbers clearly visible from other angles, including directly behind the van. See Def.'s Exs. 5-7.

Based on the photographs provided, I find that the license plate number is visible at several angles, none of which appear to be particularly "unusual." Boatright, 222 Or. App. at 414, 193 P.3d 78. Accordingly, I find that Officer Burgin predicated the traffic stop on a mistake of law that cannot establish reasonable suspicion for the traffic stop. However, I recognize that this issue is a close call, and I therefore proceed to defendant's second argument as an alternative basis for suppression.

B. Seizure of Passengers

Even if the initial traffic stop was valid, defendant argues that the continued detention of the passengers was not supported by reasonable suspicion or probable cause, and that Mr. Ramirez-Felix could not consent to an extended stop on behalf of the van's passengers. Defendant thus maintains that, absent valid consent from the passengers, their continued detention to await the canine unit constituted an unlawful seizure.

At the outset, I note that the initial stop of the van resulted in the seizure of the driver and the passengers. Brendlin v. California, 551 U.S. 249, 255 (2007) ("[D]uring a traffic stop an officer seizes everyone in the vehicle, not just the driver.").

10  - OPINION AND ORDER

The van was not stopped at a pre-determined or scheduled location, and no evidence suggests that Fronteras del Norte makes random, unplanned stops on the side of the freeway to accommodate passengers. Thus, the travel plans of the passengers clearly were "curtailed" when Officer Burgin stopped the van. Id. at 257.

The government concedes that the passengers were seized as a result of the traffic stop. Further, the government does not contend that Officer Burgin had reasonable suspicion or probable cause to detain the passengers and their luggage beyond the purpose of the initial traffic stop. See United States v. Place, 462 U.S. 696, 706 (1983); Florida v. Royer, 460 U.S. 491, 498-99 (1983); Terry v. Ohio, 392 U.S. 1 (1968).[3] Indeed, Officer Bates testified that he had "no legal right" to detain the passengers or stop them from leaving. Tr. at 85 (Nov. 8, 2012). Rather, the government maintains that Mr. Ramirez-Felix consented to the detention and canine sniff of the van, and defendant - as a passenger - could not and cannot object to his consent. The government also argues that defendant was not seized unlawfully in any event, because a reasonable passenger would have felt free to leave the scene under the circumstances.

---

[3]Even if the court accepts Officer Burgin's testimony that a passenger exited the van immediately after it pulled over and "stared intently" at Officer Burgin while smoking a cigarette, such conduct does not create a reasonable suspicion of illegal activity to justify the continued detention of the van and its passengers.

11   - OPINION AND ORDER

## 1. Third Party Consent of Mr. Ramirez-Felix

It is undisputed that Officer Burgin asked Mr. Ramirez-Felix if he would wait for the canine unit and that Mr. Ramirez-Felix agreed to do so. Defendant suggests Mr. Ramirez-Felix's consent was not "voluntary" because his compliance was a requirement of his employment. Regardless of whether he was "required" to comply, Mr. Ramirez-Felix was asked personally whether he would wait for the canine unit, and no testimony suggested that Mr. Ramirez-Felix felt threatened or coerced when he agreed to do so. Tr. 9, 14-15, 18 (Dec. 6, 2012); see United States v. Jones, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing factors). Thus, I find that his consent to wait for the canine unit was given voluntarily.

The government asserts that Mr. Ramirez-Felix's consent extinguishes defendant's ability to raise "a Fourth Amendment challenge associated with the van's continued detention," as defendant had no possessory or privacy interests in the van. Gov't Response at 11. Alternatively, the government suggests that Mr. Ramirez-Felix's consent to the detention may be imputed to defendant under the principles of third party consent. I reject both arguments.

The government cites United States v. Pulliam, 405 F.3d 782 (9th Cir. 2005) to support its argument that defendant cannot challenge Mr. Ramirez-Felix's consent to detain the van. However, Pulliam does not preclude defendant's challenge to the seizure of

12   - OPINION AND ORDER

his person or search of his luggage. In Pulliam, the Ninth Circuit simply found that the defendant, a passenger "with no possessory interest in the car," had no "reasonable expectation of privacy" sufficient to challenge a search of the car after a lawful traffic stop. Id. at 786 (citation omitted). The Ninth Circuit emphasized that the defendant did "not argue that the detention of the car *after the stop* constituted a de facto seizure of his person," and, as a result, the court did "not decide whether such an argument might have enabled Pulliam to challenge the evidence derived from the car's illegal detention" after the stop. Id. (emphasis added).

Here, unlike Pulliam, defendant does not challenge the search of a vehicle in which he has no possessory or privacy interests. Rather, as a ticketed passenger on a commercial van, defendant challenges the continued detention of his person during and after the initial traffic stop, as well as the subsequent search of his luggage.[4] Given the circumstances of the stop in this case, defendant argues that the initial and continued detention of the van constituted a "de facto seizure of his person," and he seeks to suppress evidence discovered as a result of that unlawful detention. Consequently, the court is faced with a question that was neither raised nor decided in Pulliam.

---

[4] A passenger's luggage is clearly a "personal effect" protected from unreasonable search and seizure under the Fourth Amendment. See Place, 462 U.S. at 705, 707 ("We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment.").

Moreover, the Ninth Circuit recognized that a passenger "does have standing to contest the legality of his own detention" and may "seek to suppress evidence found" as the "fruit" of the illegal detention. Pulliam, 405 F.3d at 787 (citation omitted). Thus, Pulliam is inapposite and does not foreclose defendant's motion.

Likewise, I reject the government's suggestion that Mr. Ramirez-Felix's consent permitted the continued detention of the passengers. The government cites decisions from the First and Fifth Circuits holding that suspicionless and warrantless stops of taxicabs and commercial transportation buses were "legitimized" by the drivers' consent to the stops. United States v. Woodrum, 202 F.3d 1, 8 (1st Cir. 2000); see also United States v. Hernandez-Zuniga, 215 F.3d 483 (5th Cir. 2000). The Ninth Circuit has not decided whether a driver's consent to be seized may be imputed to an unsuspecting passenger. Nonetheless, I disagree with the analyses in Woodrum and Hernandez-Zuniga and find that it may not.

In Woodrum, a program called TIPS was implemented to protect the safety of taxicab drivers, and participating taxicab owners displayed TIPS decals in rear side windows and interior passenger areas of their taxicabs. Woodrum, 202 F.3d at 4. TIPS authorized police officers to randomly stop taxicabs that featured the decals to check on the drivers' safety, and officers were encouraged to provide passengers with "a brief explanation" for the purpose of the stop. Id.

14  - OPINION AND ORDER

Defendant Woodrum was a passenger in a taxicab stopped by police officers. Id. at 5. Though the taxicab displayed TIPS decals, the officers stopped the taxicab to investigate whether Woodrum was a suspect in a nearby shooting, not to ascertain or ensure the driver's safety. Id. Ultimately, the officers discovered a firearm, drugs, and cash on Woodrum's person. Id. After being charged with firearm and drug charges, Woodrum moved to suppress evidence obtained from the stop. The motion was denied. Id.

On appeal, the First Circuit recognized that a passenger in a taxicab "has a reasonable expectation that he will not gratuitously be seized while en route" and "has a right to challenge the propriety of a traffic stop under the Fourth Amendment." Woodrum, 202 F.3d at 6. Nevertheless, the court rejected Woodrum's challenge, finding that third-party consent, normally applied to searches of property, could be applied to the seizure of persons; "there is no sound reason to restrict the principle rigidly to [the search] milieu." Id. at 11. The court reasoned that a passenger's authority "over the direction and destination of the vehicle" and a driver's "control over the vehicle's speed and route of travel" constituted "shared authority" over the taxicab such that "the passenger, by entering the cab, assumes the risk that the driver may exercise his right to stop briefly along the way." Id. at 11. Accordingly, the court held that a "passenger may be briefly detained even in the absence of his consent," and that the taxicab

15  - OPINION AND ORDER

driver's "authority to consent to a TIPS stop" "legitimized this particular stop." Id. at 8, 10.[5]

In Hernandez-Zuniga, the defendant was a passenger on a bus stopped by United States Border Patrol agents. 215 F.3d at 484. Apparently, the bus company had consented to random stops and required "its drivers to pull over and cooperate" if Border Patrol agents signaled the bus to stop. Id. at 485. Agents boarded the bus, announced they were conducting an "inspection," and instructed non-citizen passengers to have "immigration documents ready to present." Id. at 484. As the defendant was questioned, agents obtained consent to search his bag and discovered cocaine. Id. The defendant moved to suppress the evidence on grounds that the stop of the bus was an unlawful seizure, and the motion was denied.

The Fifth Circuit affirmed. Citing Woodrum, the Fifth Circuit agreed that the "the concept of third party consent" could be applied to the seizure of persons. Hernandez-Zuniga, 215 F.3d at 487. Based on the bus company's consent to be stopped by Border Patrol agents and its practice of making unscheduled stops to pick up passengers, the court found that the defendant "assumed the risk that the bus would make unplanned stops, as well as the risk that

---

[5]The court so found even though the officers did not initiate a TIPS stop, and the driver could have stopped the taxicab because of the officers' show of authority instead of his "consent" to be stopped. Woodrum, 202 F.3d at 5 ("The officers flashed their lights and the taxi pulled to the side of the road.").

16  - OPINION AND ORDER

during these stops the bus might be boarded by Border Patrol agents." Id. at 488. Further, the court held that the "public concerns" of passenger and driver safety and the enforcement of immigration laws outweighed the "limited intrusion" on the defendant's Fourth Amendment interests. Id. 488-89.

As recognized by Woodrum and Hernandez-Zuniga, third-party consent generally applies in the context of searches, where the third party has common authority over or shared access to the place or item to be searched. See United States v. Davis, 332 F.3d 1163, 1169 & n.4 (9th Cir. 2003). To extend this concept and allow a driver to consent to the seizure of passenger, the driver must exercise authority over the passenger's own *person* and freedom of movement. This is a rather remarkable proposition; as the Supreme Court noted in Terry: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry, 392 U.S. at 9 (citation omitted).

Indeed, I do not find that a passenger relinquishes authority over his or her person and "assumes the risk" of a suspicionless seizure simply by purchasing a bus ticket or flagging down a taxicab. Cf. Davis, 332 F.3d at 1169 n.4 (the Ninth Circuit has "rarely applied the 'assumption of risk'" analysis and has done so

17   - OPINION AND ORDER

only "*where the person whose property was searched clearly ceded authority over the property . . .* to the consenting third party") (emphasis added). Although the driver of a commercial passenger vehicle may exercise control over the manner in which the vehicle is driven, the passenger - by purchasing a travel ticket or paying a fare - has chosen the mode of transportation, the ultimate destination, and the route taken to that destination. See United States v. Woodrum, 208 F.3d 8, 11 (1st Cir. 2000) (Lynch, J., dissenting from denial of hearing en banc) (Woodrum II). In other words, the passenger has purchased the services of the driver and the relevant transportation company to reach an intended destination; the passenger has not "clearly ceded authority" over his or her person to the driver. Davis, 332 F.3d at 1169 n.4; Woodrum II, 208 F.3d at 12 ("But the cab driver does not, cannot, have common authority over the passenger's person.").

Further, a driver's "consent" to be seized should not be imputed to a passenger over his or her objection simply because the passenger cannot prevent a driver from obeying - or consenting to - an officer's directive. Woodrum II, 208 F.3d at 12-13. To quote Judge Lynch: "It is doubtful that a passenger, through nothing more than this relationship with the [] driver, consents to the unfettered discretion of the police to stop the [vehicle] in order to make sure that he himself is not a dangerous criminal." Id. at 11. Likewise, I cannot find that defendant, simply by traveling on

18  - OPINION AND ORDER

a van driven by Mr. Ramirez-Felix, consented to the "unfettered discretion of the police" to detain the van "in order to make sure that he" and other passengers were not transporting narcotics. To find otherwise would place the liberty interests of all commercial passengers - whether in a van, bus, taxicab, airport shuttle, or limousine - "at the mercy" of drivers when the vehicle is stopped or detained without reasonable suspicion or probable cause. Gov't Second Suppl. Response at 5. "[S]imply, and obviously, a person cannot give third-party consent to the search or seizure of *another person*." Woodrum II, 208 F.3d at 12 (emphasis added).

Aside from disagreeing with the First and Fifth Circuits' applications of third-party consent, I find Woodrum and Hernandez-Zuniga distinguishable from the facts of this case. First, Officer Burgin did not stop the van due to Mr. Ramirez-Felix's consent; he stopped it due to an alleged traffic violation. Thus, defendant is not challenging a driver's "consent" to an initial traffic stop but rather a driver's ability to consent to the seizure of passengers after the purpose of the stop has ceased.

Second, Fronteras del Norte had not consented to random stops of its vehicles along freeways in order to accommodate law enforcement's drug interdiction efforts, and no evidence suggests that passengers had "assumed the risk" that Mr. Ramirez-Felix would consent to the suspicionless and warrantless seizure of their persons and belongings. Unlike Woodrum, defendant had no notice

that Fronteras del Norte or a driver would consent to a suspicionless detention of the van. Woodrum, 202 F.3d at 4 (describing TIPS decals).[6] And, unlike the bus company in Hernandez-Zuniga, no evidence suggests that Fronteras del Norte makes random, unscheduled stops to pick up passengers on the side of I-5 such that defendant would have expected "numerous stops while en route." Hernandez-Zuniga, 215 F.3d at 485, 488.

Finally, even the First and Fifth Circuits recognized that passengers do not "assume[] the risk of every type of seizure"; rather, the reasonableness of a passenger's seizure requires consideration of "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" Woodrum, 202 F.3d at 11 (quoting Brown v. Texas, 443 U.S. 47, 51 (1979)); Hernandez-Zuniga, 215 F.3d at 488-89. Within this framework, the First Circuit explained that the protection of taxicab drivers advanced the public interest and outweighed the "rather modest intrusion on passengers' liberty" resulting from "brief" TIPS stops involving "only limited inquiries" and "a quick visual inspection of the cab's interior." Woodrum, 202 F.3d at 11-12. Similarly, the Fifth Circuit found that ensuring passenger and driver safety, preventing the transport of contraband, and "aiding"

---

[6]Though I am not persuaded that small decals on side windows or even in the interior compartment would provide actual notice to passengers that they could be subjected to random stops.

the enforcement of immigration laws rendered the stop reasonable when balanced against the "minor intrusion" on passengers' liberty interests. Hernandez-Zuniga, 215 F.3d at 488-89.

In contrast, Officer Burgin's purpose in detaining the van was to investigate and search for illegal drugs, not to promote the safety of the driver or the passengers. Further, given the location and duration of the stop, the seizure here was not "brief," "limited," or a "rather modest intrusion on passengers' liberty." Woodrum, 202 F.3d at 12. In sum, neither Woodrum nor Hernandez-Zuniga support the finding that Mr. Ramirez-Felix's consent "legitimized" the warrantless and suspicionless detention of the passengers. Woodrum, 202 F.3d at 8.

Consequently, the government cannot rely on the consent of Mr. Ramirez-Felix and must establish that the passengers freely and voluntarily consented to their prolonged detention to wait for a canine sniff of their luggage.

2. Passengers' Consent

In determining whether a seizure was consensual, the court must consider "all the circumstances surrounding the encounter." Florida v. Bostick, 501 U.S. 429, 437 (1991). Importantly, "the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given," United States v. Chan-Jimenez, 125 F.3d 1324, 1327 (9th Cir. 1997), "a burden that is not satisfied by showing a mere submission to a claim of lawful

21 - OPINION AND ORDER

authority." Royer, 460 U.S. at 497. "[T]he crucial question would be whether a reasonable person in the passenger's position would feel free to take steps to terminate the encounter." Brendlin, 551 U.S. at 262 n.6.

This case involves unique facts. In most cases involving drug interdiction efforts, police officers typically approach or board buses at regularly-scheduled stops in order to conduct a canine sniff or to ask for passengers' consent to search their luggage. See, e.g., United States v. Drayton, 536 U.S. 194, 197-98 (2002); Bostick, 501 U.S. at 431; United States v. Stephens, 206 F.3d 914, 916 (9th Cir. 2000). In those situations, officers generally do not violate the Fourth Amendment by approaching bus passengers and asking for consent to search their luggage, "so long as the officers do not convey a message that compliance with their requests is required," Bostick, 501 U.S. at 437, or "induce cooperation by coercive means." Drayton, 536 U.S. at 201.

Here, however, the Fronteras del Norte van was not stopped at a scheduled destination or checkpoint; Officer Burgin conducted a traffic stop based on an alleged motor vehicle violation and detained the van and its passengers on the side of an interstate freeway. Further, it is undisputed that Officer Burgin did not speak to the passengers himself or ask for their consent to be detained while a narcotics canine was deployed. Rather, utilizing Mr. Ramirez-Felix as an interpreter, Officer Burgin effectively

22   - OPINION AND ORDER

told the passengers that "there was going to be an inspection of the suitcases and the van." Tr. 9 (Dec. 6, 2012).

While Officer Burgin claims that he asked Mr. Ramirez-Felix to inform passengers that they were free to leave, Mr. Ramirez-Felix testified that he was not told to do so; regardless, Mr. Ramirez-Felix did not tell passengers that they could leave. Tr. 9 (Dec. 6, 2012). Officer Burgin does not speak Spanish and could not testify as to what the passengers were told. Therefore, I accept Mr. Ramirez-Felix's testimony as accurate and find that the passengers were not informed that they were free to leave the scene.

The failure to inform passengers that they could leave is significant given the nature and location of the stop. The passengers were stopped on the shoulder of a busy interstate freeway, almost one mile (in either direction) from an exit with services, in the middle of their trip from Northern California to Portland, Oregon. They were not detained at a regularly-scheduled stop with restrooms or food, and they were not within a reasonably safe walking distance to such services. Despite Officer Burgin's testimony that walking for almost a mile along a freeway would have been a reasonable and even safe option, common sense dictates otherwise, particularly when the passengers included children. Tr. 60, 66 (Nov. 8, 2012); Def's Ex. 2 at 6. Consequently, the passengers could not have been expected to meander down I-5 under those circumstances. See Pulliam, 405 F.3d at 786.

23 - OPINION AND ORDER

The government nonetheless maintains that the officers did not brandish firearms, board the van, block the van aisles or exits or otherwise exhibit intimidating behavior. Stephens, 206 F.3d at 917-18 (finding an unlawful seizure occurred when several officers boarded a bus, guarded the door, used the public address system and failed to inform passengers that they could refuse to answer questions). While true, this case involves a passenger van, not a bus; the officers could not have boarded the van or blocked its aisles as there was no room to do so. And even though the officers were not threatening or intimidating, the location of the stop foreclosed any meaningful or even reasonable opportunity to leave. Moreover, the passengers were told "there was going to be an inspection of the suitcases and the van" and to remain in the van during the canine sniff, an instruction that would have contradicted any unspoken suggestion that the passengers were free to leave.[7] Tr. 67 (Nov. 8, 2012); Tr. 9, 12 (Dec. 6, 2012).

Finally, although the government relies heavily on the fact that Officer Burgin obtained consent from Mr. Ramirez-Felix, the passengers were not aware of that fact. Cf. Brendlin, 552 U.S. at 259-60 (rejecting the argument that a passenger was not seized when the officer did not intend to "direct a show of authority" toward

---

[7] Officers Burgin and Bates both testified that after the canine sniff passengers were told to exit the van and identify or claim their luggage, which would explain why passengers exited the van at that time after being directed to remain seated. Tr. 33-34, 83 (Nov. 8, 2012).

24   - OPINION AND ORDER

the passenger). From the passengers' perspective, the van remained seized due to the traffic stop:

> An officer who orders one particular car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical point of an investigation into faulty behavior or wrongdoing . . . . [Any] attempt to leave the scene would be so obviously to prompt an objection from the officer that no passenger would feel free to leave in the first place.

Id. at 257. A traffic stop thus reflects "a societal expectation of 'unquestioned [police] command' at odds with any notion that a passenger would feel free to leave, or to terminate the personal encounter any other way, without advance permission." Id. at 258 (citation omitted). To be sure, this "societal expectation" was reinforced rather than dispelled by the circumstances of the stop and the instruction to remain in the van. It is simply untenable that a reasonable passenger – who is stopped by an officer on the shoulder of an interstate freeway, informed that police are conducting an "inspection," and directed to remain seated in a van – would have felt free to leave.

In sum, under the totality of these circumstances, no reasonable passenger would have believed that he or she had the right to leave the scene or terminate the encounter. Brendlin, 551 U.S. at 262 n.6; Bostick, 501 U.S. at 436-37. Accordingly, I find that defendant and his personal effects were seized without consent or reasonable suspicion in violation of the Fourth Amendment.

25   - OPINION AND ORDER

## CONCLUSION

For the reasons explained above, Officer Burgin did not have an objective basis or reasonable suspicion to stop the Fronteras del Norte van. Furthermore, Mr. Ramirez-Felix's consent to await the arrival of the canine unit did not extend to his passengers, and, under the circumstances, a reasonable passenger would not have felt free to leave. As a result, defendant's seizure was unlawful and the fruits of his seizure inadmissible. Accordingly, defendant's Motion to Suppress Evidence (doc. 18) is GRANTED.

IT IS SO ORDERED.

Dated this 8th day of March, 2013.

Ann Aiken
United States District Judge

26  - OPINION AND ORDER